UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| FLUOR CORPORATION, | § | |
| | § | |
|    Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:08-CV-1556-B |
| | § | |
| CITADEL EQUITY FUND LTD., | § | |
| | § | |
|    Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiff Fluor Corporation's ("Fluor") Motion for Summary Judgment
(doc. 78), and Defendant/Counterclaimant Citadel Equity Fund Ltd.'s ("Citadel") Motion for
Summary Judgment (doc. 79), both filed July 14, 2009. For the reasons set forth below, the Court
finds that Fluor's Motion should be and hereby is **GRANTED** and Citadel's Cross-Motion should
be and hereby is **DENIED**.

## I.

## BACKGROUND

Fluor issued $330 million of convertible notes ("Senior Notes") in February of 2004. (Compl.
at ¶ 14.) By May 2008, Citadel held an estimated $28 million in Senior Notes. (*Id.* at ¶15.) As a
holder of the Senior Notes, Citadel had the option to convert them into Fluor common stock
("Common Stock"), cash, or a combination of both. (*Id.* at ¶18.) Its conversion rights, along with
the rights of all Fluor note holders, were governed by an Indenture and a Supplemental Indenture
(collectively, the "Indentures"), both of which are dated February 17, 2004. (*Id.* at ¶16.)

On May 7, 2008, Fluor announced a two-for-one stock split which would go into effect on July 16, 2008.  (*Id.* at ¶21.) As a result of the stock-split, on July 16th each shareholder would receive one additional share of Common Stock for each share they held as of the record date.  However, the price of each share would be halved to ensure that each shareholder would retain the same economic value in Common Stock after the split.

After the stock-split was announced, Citadel acquired an additional $30 million in Senior Notes, bringing its total holdings to approximately $58 million.  (*Id.* at ¶15.) On June 27, 2008, after announcement but before the additional shares of stock were distributed, Citadel exercised its right to convert all $58 million in Senior Notes.  (*Id.* at ¶26.) Section 5.03(c) of the Supplemental Indenture provided how much cash and how many shares of Common Stock were owed to Citadel upon conversion.  *See* Supplemental Indenture § 5.03(c) (Fluor Ex. 3) (App.130).  The Section states in relevant part:

> "The Conversion Settlement Distribution for each $1,000 principal amount of the Senior Notes shall consist of: (i) such cash amount equal to the applicable Conversion Rate multiplied by the average Closing Price of Common Stock during the Cash Settlement Averaging Period and (ii) <u>a number of shares of Common Stock equal to the applicable Conversion Rate minus the Election Amount divided by the average Closing Price of the Common Stock during the Cash Settlement Averaging Period</u>."

*Id.* (emphasis added).

Using Section 5.03's mathematical formula, Fluor determined the cash amount and the number of shares which it owed Citadel.  Accordingly, it paid Citadel $57,981,061.37 in cash and issued it 1,429,173 shares of Common Stock. (Compl. at ¶¶ 28-29.) Citadel did not dispute the cash payment but, upon receiving its conversion proceeds, objected to Fluor's distribution of Common Stock.  (*Id.*)  The disagreement, which gives rise to the instant action, centered on the calculation used to determine the number of shares owed to Citadel as a result of the conversion.  Specifically,

the parties differed on the average "Closing Price"of Fluor common stock during the Cash Settlement Period.

Section 1.02(e) of the Supplemental Indenture defines Closing Price as "the closing sale price per share of the Common Stock...on that date as reported in composite transactions for the principal U.S. securities exchange on which Common Stock is traded." Supplemental Indenture § 5.03(c)(Fluor Ex. 3)(App. 97-98). For purposes of these Motions, the parties do not dispute that the principal U.S. securities exchange on which common stock is traded is the New York Stock Exchange ("NYSE").  The parties also agree that the Cash Settlement Period is the ten-day trading period which began after Fluor received Citadel's conversion notice.  (Compl. at ¶ 35; Ans. at ¶ 35.); *see also* Supplemental Indenture § 5.03(c)(Fluor Ex. 3)(App. 97-98). Additionally, it is undisputed that the prices which were reported by the NYSE during the Cash Settlement Period come to an average of $177.60.  (Compl. at ¶ 43; Ans. at ¶ 43.)

Still, Fluor, taking into account the stock-split, determined the average Closing Price for a single share of Common Stock to be $88.80 and used this amount to calculate the number of shares of Common Stock owed to Citadel upon conversion.(Compl. at ¶ 43.)   Had Fluor used $177.60 rather than $88.80 in making the conversion calculation, Citadel would have received 1,755,626 shares of Common Stock, or 326,453shares more than it was issued.  (Def.'s Br. in Supp. Mot. Summ. J. 12.)

In support of its calculation, Fluor argues that the closing prices reported during the relevant period were not the prices per share of Flour common stock.  (Compl. at ¶ 43.)  It contends that shares traded after the stock-split was announced but before the split dividends were distributed had a "due-bill" attached.  (*Id.* at ¶ 42.)  A due-bill is a written acknowledgment of an obligation to deliver a share of stock which has not been disbursed but has already been purchased.  Once the split

dividends are distributed, the buyer can exchange his due-bill for the share of common stock owed to him. Fluor claims that because the due-bills were reflected in the closing prices reported during the Cash Settlement Period, the average Closing Price for a single share of Common Stock was half of the amount reported by the NYSE on those days, or $88.80. (*Id.* at ¶ 43.)

In response, Citadel argues that the prices reported were, in fact, the prices per share. (Def.'s Br. in Supp. Mot. Summ. J. 12.) Citadel reasons that a due bill is merely a right attached to a single share of stock and not an existing share of stock. (*Id.*) Because the split dividends did not exist before the distribution date, Citadel argues, they are irrelevant for purposes of calculating the Closing Price per share. Moreover, Citadel urges that Fluor must use the prices as they were reported by the NYSE. (*Id.*) Because $88.80 was not the price as reported, Citadel contends Fluor may not use it in its calculations. (*Id.* at 13.)

In light of Citadel's contentions, Fluor commenced this action for declaratory judgment on September 3, 2008. It seeks a judgment from the Court declaring that it complied with the governing Indentures and that Citadel is not entitled to additional shares of Common Stock. Citadel subsequently filed a breach of contract counterclaim. Citadel is seeking a judgment requiring Fluor to provide it with the value of the 326,453 shares of common stock, or $28,296,946. Both parties have filed motions for summary judgment. The Court convened a hearing on the Motions on Tuesday, October 6, 2009 at 3:00 p.m. Having considered the Motions, the briefings, and the parties' oral arguments, the Court now turns to the merits of its decision.

## II.

## LEGAL STANDARD

A.    *Summary Judgment Standard*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate

when the pleadings and record evidence show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003). The burden lies on the summary judgment movant to prove that no genuine issue of material fact exists. *Latimer v. Smithkline & French Lab.*, 919 F.2d 301, 303 (5th Cir. 1990). To determine whether a genuine issue exists for trial, the court must view all of the evidence in the light most favorable to the non-movant and all inferences must be drawn in its favor. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000). If the evidence submitted would allow a reasonable jury to return a verdict for the non-movant, a genuine issue remains and the court cannot grant summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

B.      *Contract Interpretation under New York Law*

It is undisputed that New York substantive law governs the Indentures at issue in this case. "Under New York law, a written contact is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language that they have employed." *Broad v. Rockwall International Corporation,* 642 F.2d 929, 946 (5th Cir. 1981). A court must fairly and reasonably interpret the contract consistently with its intended purpose. *Id.* However, what the parties intended is only relevant to the extent that such intentions are evidenced by the language of the contract. *Id.* at 947.

When a contract provision is unambiguous on its face and the intention of the parties is clear, extrinsic matters should not be considered. *Id.; see also R/S Assoc. v. New York Job Devel. Auth.,* 98 N.Y.2d 29, 33 (N.Y. App. Div. 2002) (holding that unless the court finds ambiguity, evidence outside the four corners of the contract is generally inadmissible). Moreover, extrinsic evidence is not admissible to create ambiguity in a contract which is complete, clear and unambiguous on its face. *W.W.W. Associates, Inc. v. Giancontieri,* 77 N.Y.2d 157, 163 (N.Y. 1990).

Words and phrases should be given their plain meaning. *Broad*, 642 F.2d at 947. "The parties having agreed upon their own terms and conditions, 'the courts cannot change them and must not permit them to be violated or disregarded.'" *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) (quoting *Whiteside v. North American Accident Ins. Co.*, 200 N.Y. 320, 326 (N.Y. 1911)).

## III.

## ANALYSIS

A.    *Section 1.02(e) of the Supplemental Indenture is Unambiguous*

As an initial matter, the Court must determine whether the language employed in the Indentures is unambiguous. *See W.W.W. Associates*, 77 N.Y.2d at 162 (finding that whether or not ambiguity exists in a contract is a question of law to be resolved by the court). A contract provision is unambiguous when it has a "definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Breed v. Ins. Co. of North America*, 46 N.Y.2d 351, 355 (N.Y. 1978).

For example, in *Reiss*, the court found that certain stock warrants were unambiguous where the language was clear and complete on its face. *Reiss v. Financial Performance Corp.*, 97 N.Y.2d 195 (N.Y. 2001). There, the plaintiff sought to exercise its stock warrants after the defendant had declared a reverse stock-split. *Id.* at 198. The plaintiff alleged that it was entitled to purchase the stock, in accordance with the terms of the warrant, at the pre-split price of 10 cents per share and without an adjustment to the number of shares that could be purchased. *Id.* at 199. The defendant argued the language of the warrants was ambiguous because it did not account for a circumstance of a reverse stock-split. *Id.* The court, applying New York principles of contract construction, held

that the omission of a term which addressed this contingency did not alone create ambiguity where the language was clear and definite.  *Id.*

Similarly, in *Metropolitan Life*, the court found language in an indenture unambiguous where it expressly limited the period of time during which the defendant company could cure default under the indenture.  *Metropolitan Life*, 906 F.2d at 889.  In that case, the defendant argued for a tolling of the cure period pending the resolution of litigation based on the merits of the default notice.  *Id.* The court rejected this argument finding that where a time period for curing was clearly and explicitly stated, and there was no provision made for the contingency of litigation, the language unambiguously expressed the parties' intentions.  *Id.*

Fluor and Citadel have both identified the phrase "closing price per share… as reported" in Section 1.02(e) of the Supplemental Indenture as the language central to this dispute.  Like the language at issue in both *Reiss* and *Metropolitan Life*, this phrase has a clear and definite meaning. In its ordinary usage, it means the last price at which a single share of stock traded on a particular trading day as it was reported by the NYSE.   There is no uncertainty that the drafters of the Indentures intended that Fluor look to the prices reported to determine the average Closing Price for one share of Fluor stock during the Cash Settlement Period.

The Court will not declare the phrase ambiguous simply because Fluor and Citadel have differing interpretations of the plain meaning of the language.  Opposing views on the meaning of a contract term do not mandate a finding of ambiguity where the court finds that only one of those interpretations is reasonable.  *See RM Realty Holdings Corp. V. Moore*, 884 N.Y.S.2d 344, 346 (N.Y. App. Div. 2009) ("A written agreement is ambiguous only if its is *reasonably* susceptible to more than one interpretation."); *Metropolitan Life*, 906 F.2d at 889 (citing *Bethlehem Steel Co. v. Turner*

*Construction Co.,* 2 N.Y.2d 456, 459, (N.Y. 1957) (holding that a court should not find ambiguity based on the interpretation of one party to a contract, where that interpretation would 'strain the contract language beyond its reasonable and ordinary meaning')); *Breed,* 46 N.Y.2d at 355 (finding ambiguity only where "reasonable men may reasonably differ" as to the interpretation). As discussed below, only Fluor's interpretation is supported by the language of the Indentures as a whole and by the parties' intent as evidenced by that language. Accordingly, the Court finds that the phrase "closing price per share... as reported" in Section 1.02(e) of the Supplemental Indenture is unambiguous and extrinsic evidence should not be considered in determining the parties' rights and obligations under the Indentures.

B.      *Fluor Correctly Determined the Closing Price Per Share*

Because the language of the Supplemental Indenture is unambiguous, the Court need not address the parties' arguments based on offers of extrinsic evidence. The parties' intent must be ascertained exclusively through the interpretation of the terms within the four corners of the Indentures. *ABS Partnership v. AirTran Airway, Inc,* 765 N.Y.S.2d 616, 620 (N.Y. App. Div. 2003). Still, the Court must adopt a reading of the language which gives effect to all of the Indentures' provisions and produces a result consistent with the parties' reasonable expectations as evidenced by the language. *See id.* at 619 (finding the court must interpret an unambiguous contract in a way which gives effect to all its provisions); *Jellinick v. Joseph Naples &Associates,* 744 N.Y.S.2d 610, 613 (N.Y. App. Div. 2002) (finding the court should interpret the terms of a contract "so that the parties' reasonable expectations are realized"). In  light of these prescriptions, Court finds that Fluor's interpretation is the only appropriate reading of the plain language of the agreement.

The Supplemental Indenture states that the closing sale price must be "per share" as reported

by the NYSE.  Under most circumstances, the price reported by the NYSE is the price for a single share of stock.  However, in this case, the reported prices during the Cash Settlement Period reflected the price of a share of stock plus that of a future share of stock.  Therefore, the plain and ordinary meaning of the words " per share" required the price of the future dividend to be subtracted from the NYSE reported price.  Only then could Fluor arrive at the closing price for a single share of Common Stock and be in compliance with the terms of the Supplemental Indenture.

Citadel argues that the language of Section 1.02(e) of the Supplemental Indenture requires Fluor to use the prices "as reported" by the NYSE, regardless of the added value of the due-bill.  However, this strict and rigid interpretation of the Closing Price definition would render the words "per share" meaningless and would not give effect to the intentions of the parties as evidenced by the language of the Indenture.  *See Jellinick*, 744 N.Y.S.2d at 613 (finding that the court must not adopt an interpretation which leaves a contract provision without effect).  The plain meaning of the words "per share" demonstrates that the drafters of the Indentures intended for the Closing Price used in the conversion calculation to reflect the price of one share of Fluor common stock and nothing else.  It is evident that the prices reported during the Cash Settlement Period were not only for a share of stock.  Buyers who purchased Common Stock on those trading days knew that they were receiving one share of stock <u>and</u> an instrument which entitled them to a separate share of stock in a month's time.  This is the reason they paid $177.60.  It would defy reason and logic to find instead that they were buying shares of stock worth $88.80 at double the price.  This Court cannot adopt a reading of the Indentures which is grounded on such an illogical premise.

Adopting Fluor's interpretation, on the other hand, gives effect to both "per share" and "as reported."  Fluor used the closing prices as they were reported by the NYSE to calculate the price

of a share of Common Stock on each of the relevant trading days.  These numbers were not "made-up," as Citadel argues.  They were derived from the price of the Common Stock as it was reported by the NYSE.  Given that the prices reported reflected the value of two shares of stock, Fluor needed to go one step further and adjust them in order to comply with the requirement that the price be "per share."

Aside from making the words "per share" superfluous, Citadel's rigid interpretation would lead to inconsistencies within the Indentures and unreasonable results. *See Broad*, 642 F.2d at 947 (finding that all parts of the agreement are to be reconciled to avoid inconsistencies); *see also Fresh Del Monte Produce v. IAT Group, Inc.*, 836 N.Y.S.2d 160, 164 (N.Y. App. Div. 2007) (finding that contracts should not be interpreted so as to produce unreasonable results).  The Court must examine the contract as a whole to determine the parties' intent.  *See Jellinick*, 744 N.Y.S.2d at 613. Here, a separate provision in the Indentures directs Fluor to adjust the conversion rate when certain corporate events take place, one of which is a stock-split.  Supplemental Indenture § 5.07 (a) (Fluor Ex. 3) (App. 132).  This provision was included in the Indentures so that the value of the Senior Notes was not affected by these corporate occurrences.  If the Court were to read the definition of Closing Price in the way Citadel urges we should, the result would be wholly inconsistent with the intended purpose of this anti-dilution provision.  Specifically, it would bestow a $28 million windfall on Citadel simply because Fluor declared a stock-split.  Such a result is absurd and directly contradicts the reasonable expectations of the parties. *See In re Application of Lipper Holdings, LLC*, 766 N.Y.S.2d 561, 562 (N.Y. App. Div. 2003) ("A contract should not be interpreted to produce a result that is absurd or contrary to the reasonable expectations of the parties."); *see also Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 618 N.Y.S.2d 882, 886 (N.Y. 1994) (citing *Fleischman v.*

*Furgueson,* 223 N.Y. 235, 241 (N.Y. 1918) ('Language in contracts placing one party at the mercy of the other is not favored by the courts')).

Nevertheless, Citadel contends that this case is analogous to *Reiss.* It argues that, like the plaintiff in *Reiss*, it should be allowed to profit from the stock-split because there is no provision in the Indentures allowing for an adjustment of the Closing Price. This argument is not persuasive. In addressing the plaintiff's windfall, the *Reiss* court found that the parties *intentionally* omitted a provision which allowed for a price adjustment. *Reiss,* 97 N.Y.2d at 200. There, the evidence clearly showed that the parties had contemplated including such a provision but had opted not to do so. *Id.* In fact, the record showed that the parties had added the price-adjustment provision to other stock warrants which had been issued to different investors. *Id.* The court reasoned that it could not imply a term into an agreement which the parties chose not to include at the time of drafting. Thus, the court's interpretation of the unambiguous language in the indenture was consistent with the parties' intention to omit the provision in the warrants.

In contrast, here, nothing in the record suggests that the parties contemplated including a term which would adjust the Closing Price in the event of a stock-split. By the Citadel's own admission, adding a price-adjustment provision to the definition of Closing Price was never given any consideration. (Mot. Summ. J. Hr'g Tr. 54:15-54:18, Oct. 6, 2009.) The omission of this term was not something which the parties bargained-for in entering into this contract. Moreover, this case is distinguishable in that the Court does not need to imply a new term into the Indentures to find that the closing prices reported by the NYSE needed to be adjusted before being used in the conversion calculations. This finding is required by the plain and ordinary meaning of the words "per share" in Section 1.02(e) of the Supplemental Indenture.

Because the Court should not interpret a contract to produce absurd results, or results which are contrary to the parties' intent, the Court rejects Citadel's reading of Section 1.02(e) of the Supplemental Indenture. Instead, the Court finds that the plain and ordinary meaning of the words "closing price per share... as reported" required Fluor to deduct the value of the split dividend to arrive at the Closing Price per share. Thus, Fluor complied with the provisions in the Indentures and Citadel is not entitled to recovery on its breach of contract claim.

## IV.

## CONCLUSION

For the foregoing reasons, the Court finds that Fluor is entitled to judgment as a matter of law. The Court accordingly **GRANTS** Fluor's motion for summary judgment in its entirety. The Court will separately enter a judgment.

SO ORDERED.

SIGNED January 15th , 2010

_____

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE